Billy D. **MARTIN**

v.

**GEORGIA GULF CORPORATION.**

Civ. A. No. 88–134–B.

United States District Court,
M.D. Louisiana.

Sept. 30, 1993.

John B. Lambremont, Sr., Calvit & Lambremont, Baton Rouge, LA, for plaintiff.

William R. D'Armond, Melanie Moreland Hartmann, Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, Baton Rouge, LA, for defendant.

**OPINION**

POLOZOLA, District Judge.

Billy D. Martin seeks to be declared a "disabled purchaser" under the terms of a Restricted Stock Purchase Agreement (Agreement) executed by Martin and Geor-

---

**8.** *Id.*

gia Gulf Corporation (Georgia Gulf). After reviewing the evidence presented at the trial, including the credibility of the parties, the Court finds that Martin was not a disabled purchaser within the meaning of the Agreement.

## I. Facts and Procedural History

Georgia–Pacific Corporation, the predecessor to Georgia Gulf Corporation, hired Billy Martin as a maintenance superintendent in 1979. In 1985, Georgia Gulf transferred Martin to the position of safety analyst. Martin retained this position until 1987.

During his tenure as a safety analyst, Martin apparently became increasingly concerned about the effectiveness of safety procedures implemented by Georgia Gulf. Martin was particularly concerned about the safety of a proposed procedure to shut down the phenol unit at Georgia Gulf's Plaquemine plant in January of 1987. Although Martin proposed alternative methods for the job which he believed posed fewer risks to plant employees, none of Martin's suggestions were accepted by Georgia Gulf officials. Instead, the company's plans and procedures to shut down the phenol unit continued as scheduled.

On January 19, 1987, Don Carloss, Martin's supervisor, informed him that the procedure to shut down the phenol unit would begin immediately, and that Martin would be required to monitor the procedure until it was completed. Apparently upset by the failure of Georgia Gulf to adopt his suggestions, Martin personally delivered a written notice of resignation to Harry Lloyd, the Industrial Relations Manager at Georgia Gulf.[1] In his handwritten resignation, Martin stated: "Please accept my resignation effective this date. I find myself in an intolerable position due to circumstances beyond my control." Dean Atkinson, Georgia Gulf's Industrial Relations Superintendent, was also present when Martin delivered his resignation to Lloyd.[2] Martin explained that he resigned because he could no longer work for

Don Carloss. Martin also stated that he had thought about resigning for some time.

Following his resignation, Martin apparently realized the effect his decision to resign had on his family and him personally. He then sought treatment from Dr. Wyman Walker, Martin's family physician, for various symptoms including insomnia, moodiness, and an inability to focus. Dr. Walker referred Martin to Dr. William Gladney, a neurologist. Dr. Gladney's examination revealed that Martin did not suffer from any neurological deficiencies. Dr. Gladney referred Martin to Dr. Lawrence Wade, a psychiatrist. Dr. Wade prescribed anti-depressant medication which Martin began taking immediately. Thereafter, Dr. Wade noticed some improvement in plaintiff's condition, and wrote a letter to Georgia Gulf with the plaintiff's knowledge and consent suggesting that Georgia Gulf reject Martin's resignation and allow him to return to work. Wade also recommended that Martin be reinstated to some job other than his previous position as a safety analyst. On January 30, 1987, eleven days after Martin resigned, Georgia Gulf received a letter from Martin asking that his resignation be revoked, and he be allowed sick leave to continue his medical treatment. Georgia Gulf refused plaintiff's request to have his letter of resignation revoked.

During his employment with Georgia Gulf, Martin executed a Restricted Stock Purchase Agreement. Pursuant to this agreement, Martin purchased 150 shares of Georgia Gulf stock for one dollar per share. The agreement provided that twenty percent of the stock would vest on April 16, 1987, and an additional 20 percent would vest on the same date each year through 1991. However, if Martin's employment with Georgia Gulf terminated before all of the stock had vested, the agreement provided that Martin must sell all non-vested shares back to Georgia Gulf at a price of one dollar per share. The agreement further provided that if Martin was declared a "disabled purchaser," all of the stock would vest immediately. The purchase agreement defines a disabled purchaser as:

---

1. Lloyd now holds the title of Employee Relations Manager.

2. Atkinson now holds the title of Employee Relations Superintendent.

[A] purchaser who, as determined by a licensed physician acceptable to the Committee, and evidenced by a certificate to the Company, is completely unable to engage in his regular occupation as an employee of the Company, provided, however, that the determination of the Committee in its sole discretion as to the classification of a Purchaser as a Disabled Purchaser shall be final.

Martin sued Georgia Gulf for specific performance of the Restricted Stock Purchase Agreement. Martin contends that on January 19, 1987, the date of his resignation, he was a disabled purchaser under the terms of the agreement. Therefore, he claims the ownership of the 150 shares of Georgia Gulf stock vested in him at that time. Georgia Gulf contends that Martin was not a disabled purchaser on January 19, 1987. Therefore, Georgia Gulf claims that the ownership of the stock did not vest in Martin and Martin was obligated to sell back to the company all of the non-vested shares in his possession as of the date of his resignation.

This case was originally tried by the Court without a jury in August of 1992. During the course of the trial, Dennis Chorba, vice-president of Legal Affairs during Martin's tenure with the company, testified that he made the decision to deny Martin's status as a disabled purchaser without consulting the Stock Option Committee. Plaintiff argued that this violated the Restricted Stock Purchase Agreement which provided that the determination of whether a purchaser is disabled under the agreement is within the "sole discretion" of the Stock Option Committee. At the conclusion of the evidence plaintiff filed a motion for a judgment on partial findings under Rule 52(c) of the Federal Rules of Civil Procedure. The Court found that Chorba did not possess the authority under the agreement to determine Martin's status as a disabled purchaser. Therefore, the Court stayed the proceedings and ordered the parties to submit all evidence, including the trial testimony, to the committee for a determination of whether Martin was a completely disabled purchaser pursuant to the terms of the agreement.

The committee, after considering the trial testimony, medical depositions, and affidavits, determined that Martin was not a disabled purchaser within the meaning of the agreement. In support of its determination, the committee found that Martin was not completely unable to engage in his regular occupation, and his disability, if any, did not continue for a substantial period of time as required by the agreement. The Committee also concluded that the minimum duration of disability that would entitle a plaintiff to vesting of stock under the "complete disability" provision of the agreement is 22 weeks, the same period of time required for an employee to qualify for long-term benefits with the company.

After the committee rendered its decision, the case returned to this Court for further proceedings. All evidence has now been submitted, post-trial briefs have been filed, and the Court has heard oral arguments in this case.

## II. Standard of Review

The scope of judicial review of a fiduciary charged with the administration of a private pension plan is governed by La.R.S. 49:964(G).[3] Section 964(G) provides:

The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

(1) In violation of constitutional or statutory provisions;

(2) In excess of the statutory authority of the agency;

(3) Made upon unlawful procedure;

(4) Affected by other error of law;

(5) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or

(6) Manifestly erroneous in view of the reliable, probative, and substantial evidence on the whole record. In the application of the rule, where the agency has

---

**3.** *Hay v. South Cent. Bell Tele. Co.,* 475 So.2d 1052, 1055 (La.1985).

the opportunity to judge of [sic] the credibility of witnesses by firsthand observation of demeanor on the witness stand and the reviewing court does not, due regard shall be given to the agency's determination of credibility issues.[4]

Therefore, the Court is required to conduct a factual review, a procedural review, a statutory or constitutional review, and a substantive review of the committee's decision.[5] In *Hay v. South Central Bell*,[6] the Louisiana Supreme Court set forth the review function as follows:

Clearly, the court's function is not to reweigh the evidence and substitute its judgment for that of the committee. The manifest error standard is therefore used to review the committee's factual findings. However, that standard is not applicable when there are no factual issues. On the other hand, the arbitrariness standard is applicable when the central issue involves the committee's exercise of discretion. The court, nevertheless, retains its traditional primacy in interpreting constitutional or statutory provisions and in enforcing correct procedures.[7]

In the present case, the phrase, "disabled purchaser" *is* defined in the contract. The contract further provides that: (1) the committee shall have absolute discretion in the classification of a purchaser as a disabled purchaser; and, (2) any decision by the committee in this regard is final.

The committee determined that Martin was not a disabled purchaser within the meaning of the agreement. During its deliberations, the committee divided its examination into two distinct inquiries. The committee first determined the meaning of the term "disabled purchaser" under the agreement. The committee then decided whether Martin

qualified as a disabled purchaser within the terms of the agreement.

The agreement defines a disabled purchaser as a purchaser "who, as determined by a licensed physician acceptable to the Committee, and evidenced by a certificate to the Company, is completely unable to engage in his regular occupation as an employee of the Company." The committee found that the complete disability referred to in the agreement required an element of permanency. Considering the intent of the parties to the agreement, the language in the agreement, and previous interpretations of the agreement by the committee, the committee concluded that "complete disability requires that at a minimum the disability and resulting inability to return to work continue for a substantial period of time."[8]

The committee also found that the agreement, which required a five year period for the complete vesting of stock, was intended to encourage long term employment for Georgia Gulf employees. Therefore, the committee held that it would defeat the purpose of the plan to award shares of stock to employees who did not have a long term disabling illness or injury. The committee found that if Martin's contentions were accepted, it would be possible for an employee suffering from the flu or from a broken arm to qualify as a disabled purchaser and receive shares of stock in full ownership.

The Court finds that whether the Court applies the manifest error standard, the arbitrariness standard, or de novo standard, the committee's factual and legal interpretations are correct. The Court also finds that the committee's findings were supported by the evidence presented to the committee and this Court. Accordingly, the Court finds as a matter of fact and law that the plaintiff

---

4. La.R.S. 49:964(G) (1987).

5. *Hay,* 475 So.2d at 1055.

6. In *Hay,* the widow of a former South Central Bell employee sued South Central Bell to recover death benefits under the company's plan for employees' pensions, disability benefits and death benefits. The court found that the phrase "living together" should be interpreted as a matter of

law, since it was not defined in the contract. In so doing, the Court held that deference must be given to the intention of the contract and the meaning, if any, developed under judicial decisions and statutes.

7. *Hay,* 475 So.2d at 1055.

8. Letter from Stock Option Committee to Billy Martin, dated September 17, 1992, at page 2.

was not a "disabled purchaser" under the terms of the agreement.

Prior to Martin's resignation, he was working on a full time basis. There was no evidence that he was disabled under any legal or medical definition at the time he resigned. Martin voluntarily resigned from Georgia Gulf, citing differences with his supervisor, Don Carloss. The fact that Martin disagreed with the methods utilized by Georgia Gulf does not support a finding that he was disabled at the time of his resignation. On January 21, 1987, Dr. Walker wrote a letter to Georgia Gulf on behalf of Martin, requesting that Martin's resignation be revoked and Martin be allowed sick leave. Martin testified at trial that he and his wife personally delivered this letter to Georgia Gulf on January 23, 1987. Over a period of several months, Martin continually attempted to be reinstated at Georgia Gulf. Martin's actions in seeking reinstatement hardly support his contention that he was a disabled purchaser.

Furthermore, the term "disabled purchaser" as defined by the agreement, the committee, and this Court includes as an important element a degree of permanency. On February 23, 1987, Dr. Wade released Martin to return to work at Georgia Gulf in his original position as safety analyst without any restrictions. Thus, one month after his resignation, Martin was fully competent to return to work. Aggravation at a supervisor does not constitute disability. The fact that Martin regretted his decision to resign and thereafter sought treatment in connection with his decision did not make him a disabled purchaser. Finally, any problems he may have had some two years after his resignation cannot be applied retroactively to January 19, 1987.[9]

In short, the Court finds that Martin's disability was not of sufficient duration to qualify Martin as a disabled purchaser under the terms of the agreement.

Therefore:

9. At trial, the plaintiff introduced a certified copy of a Social Security Administration record of Martin. Over the defendant's objections, the Court has considered these documents in reaching its decision. However, these documents

Judgment shall be entered dismissing the plaintiff's suit with prejudice at plaintiff's costs.

have little, if any, relevance to the issues pending before this Court. The standards for disability for Social Security are different, and the dates of disability began long after the plaintiff resigned from Georgia Gulf.